**Philip M. PERKINS, Plaintiff**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant**

**No. CIV.A. 02–30101–KPN.**

United States District Court,
D. Massachusetts.

May 20, 2003.

Marshall Moriarty, Esq., Moriarty and Connor, LLC, Springfield, for Philip M. Perkins, Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, for Jo Anne Barnhart, Commissioner of Social Security, Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE and DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 7 and 10)*

NEIMAN, United States Magistrate Judge.

This matter is before the court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), which provide for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Supplemental Security Income ("SSI") disability benefits. Philip Perkins ("Plaintiff") claims that the Commissioner's decision denying him SSI benefits—memorialized in a April 23, 2001 decision by an administrative law judge—is not supported by substantial evidence and is predicated on errors of law. Plaintiff has moved to reverse or remand the decision and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been reassigned to the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including entry of judgment. For the reasons set forth below, the Commissioner's motion to affirm will be denied and Plaintiff's motion will be allowed, but only to the extent a remand is appropriate.

## I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to sup-

port a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

 To be sure, the resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez*, 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir.1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter … a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand[ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff, born on April 4, 1963, completed the ninth grade and worked as a painter, donut maker and die cutter until he injured his back on November 10, 1999. (Administrative Record ("A.R.") at 90, 95.) He resides in Florence, Massachusetts.

### A. MEDICAL RECORDS

On November 10, 1999, Plaintiff was admitted to Baystate Medical Center after falling fourteen feet from a roof he had been shingling. (A.R. at 143.) A CT scan of Plaintiff's spine revealed several fractures and a bone fragment in his spinal canal. (A.R. at 171.) A chest x-ray demonstrated that Plaintiff also had left and perhaps right basilar atelectasis and infiltrate, but not pneumothorax.[1] (A.R. at 176.)

The following day, November 11, 1999, Dr. Kamal Kalia performed a spinal fusion and canal decompression and yet additional repairs occurred the next day. (A.R. at 151–155.) A post-surgical x-ray revealed that Plaintiff had no acute hemorrhage or hematoma formation, his bone plug was in satisfactory position and, despite tiny bony fragments, his central canal had an improved appearance. (A.R. at 182.)

On November 22, 1999, Plaintiff was discharged to the Weldon Center for Rehabilitation. (A.R. at 185.) The discharge summary noted that Plaintiff required spinal cord injury rehabilitation in order to learn how to apply a "TLSO brace." (A.R. at 184.) Plaintiff's condition was described as "fair" and he was prescribed a variety of medications: Heparin, Haloperidol, Percocet and Librium.[2]

---

1. "Atelectasis" is decreased or absent air in the entire or part of the lung with a resulting loss of lung volume while "pneumothorax" is the presence of free air or gas in the pleural cavity *Stedman's Medical Dictionary* 161, 1412 (27th ed.2000). These and other medical references are taken from the Commissioner's memorandum of law.

2. Heparin is an anticoagulant, Haloperidol is usually used to manage psychotic disorders, Percocet is for pain relief and Librium is used to manage anxiety. *Physicians' Desk Reference* 1211, 1536, 2334, 3376 (55th ed.2001.)

Dr. Gregg Wolff examined Plaintiff at the Weldon Center and found that he was in no acute distress. (A.R. at 187.) Dr. Wolff observed that Plaintiff's motor strength was "five out of five" in his bilateral upper extremities and plantar flexion in his right foot; "four out of five" in the plantar flexion in his left foot; and "two out of five" to "three out of five" in his hip flexor. (*Id.*) Dr. Claude Borowsky, who also examined Plaintiff upon admission, recommended that his rehabilitation include physical and occupational therapy, a general psychological evaluation and ongoing pain control. (A.R. at 190.)

An x-ray on November 26, 1999, showed Plaintiff's fusion hardware to be intact, but also mild levoscoliosis in his upper thoracic spine and a small osteophyte.[3] (A.R. at 208.) A CT scan of Plaintiff's abdomen revealed fluid collecting in certain soft tissues, discoid atelectasis and a small pleural effusion in his right lung base. (A.R. at 210.)

Plaintiff's physical therapy lasted from November 23 through December 15, 1999. (A.R. at 196–204.) At the beginning, the therapist found that decreased strength and range of motion were affecting Plaintiff's mobility. (A.R. at 199.) By the end of the course of treatment, however, Plaintiff's strength and range of motion were within normal limits. (A.R. at 203.) The Weldon Center's December 17, 1999 discharge summary noted that Plaintiff had modified independence with activities of daily living and was capable of early ambulation using an immobilizer for his right lower extremity. (A.R. at 193.) Plaintiff was instructed to continue with his outpatient physical therapy and was prescribed Heparin, Percocet and Oxycontin.[4] (*Id.*).

At a January 3, 2000 follow-up examination, Dr. Kalia found Plaintiff's legs to have improved but noted the need for another fusion surgery which Plaintiff underwent on January 11, 2000. (A.R. at 216, 218.) On discharge seven days later, the physicians noted that Plaintiff's right hip flexion strength was "three plus out of five" and that his lower extremity motor strength was "four plus out of five." (*Id.*)

On January 24, 2000, Dr. Kalia noted that Plaintiff was able to ambulate, that his lower extremity strength continued to improve and that he was doing well. (A.R. at 217.) He recommended that Plaintiff continue with the TLSO brace and have additional x-rays in a month. (*Id.*) One month later, on schedule, Dr. Kalia noted that Plaintiff's x-rays looked good, that the fusion was stable and that Plaintiff was neurologically unchanged. (A.R. at 251.) He referred Plaintiff to a pain clinic for medication. (*Id.*) Doctors there prescribed Methadone and Percocet. (A.R. at 236–37.)

On May 22, 2000, Dr. Kalia again noted that Plaintiff's fusion was stable and that he was ambulating, although with some numbness in his right leg. (A.R. at 250.) In a form completed for the Social Security Administration, Dr. Kalia stated that, while Plaintiff had a limited ability to ambulate and was not to lift or bend, his major functions had been restored and his prognosis was good. (A.R. at 242.)

According to the final medical record, dated August 21, 2000, Plaintiff told Dr. Kalia that he was feeling much better. (A.R. at 250.) Dr. Kalia, in turn, noted that Plaintiff still had pain in his right leg, but that his condition and fusion were stable and the curvature of his back was

---

3. An osteophyte is a bony outgrowth or protuberance. *Stedman's* at 1285.

4. Oxycontin is used to relieve pain. *Physician's Desk Reference* at 2698.

fine. (*Id.*) He told Plaintiff to return in six months for follow-up x-rays. (*Id.*)

## B. PROCEDURAL HISTORY

On November 24, 1999, two weeks after his accident, Plaintiff applied for SSI disability benefits. (A.R. at 66–67.) His application was denied initially and upon reconsideration. (A.R. at 44–47, 50–53.) Plaintiff then requested a hearing before an administrative law judge ("ALJ").

During the administrative process, two non-examining agency physicians reviewed Plaintiff's medical records and concluded that he could lift ten pounds frequently and twenty pounds occasionally and sit, stand and walk for six hours in an eight-hour day. (A.R. at 229, 245.) One of the physicians, Dr. Avad Ramachandra, further noted in a report dated February 22, 2000, that Plaintiff had frequent limitations in his ability to climb, balance, kneel and crawl and occasional limitations in his ability to stoop and crouch. (A.R. at 230.) In some contrast, Dr. Jorge Baez–Garcia, the other agency physician, stated in a report dated June 1, 2000, that Plaintiff had only occasional limitations in his ability to climb, stoop, kneel, crouch and crawl; he also noted that Plaintiff should avoid hazards. (A.R. at 246, 248.)

Plaintiff's hearing was held on January 17, 2001. After reviewing the evidence of record, the ALJ concluded in a decision dated April 23, 2001, that Plaintiff was not disabled. (A.R. at 7–15.) Plaintiff's request for review by the Appeals Council was denied on April 26, 2002, thereby making the ALJ's decision the final decision of the Commissioner. (A.R. at 4–5.) *See* 20 C.F.R. §§ 416.1455, 416.1481 (2003).

## III. DISCUSSION

An individual is entitled to SSI benefits if, among other things, he is needy and disabled. *See* 42 U.S.C. §§ 1381a and 1382c(a)(3). Plaintiff's financial need is not challenged. The question, therefore, is whether he suffers from a disability.

## A. DISABILITY STANDARD AND THE ALJ'S DECISION

An individual is considered disabled if he is unable to participate in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is considered disabled under the Act:

> only if his physical of mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimants physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of

severity, he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth, . . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: that Plaintiff has not engaged in substantial gainful activity since the alleged onset of his disability (question one); that he has an impairment that is "severe," although not severe enough to be listed in Appendix 1 (questions two and three); that he is unable to perform any of his past relevant work (question four); but that he is able to perform "a significant range of sedentary work" in the national economy (question five). As a result, the ALJ concluded that Plaintiff does not suffer from a disability. (A.R. at 14–15.)

## B. ANALYSIS OF PLAINTIFF'S CHALLENGE TO ALJ'S DECISION

Plaintiff mounts two challenges to the ALJ's decision, one focused on the third step of the five-step protocol and one on the fifth step. Plaintiff first argues that the ALJ's finding as to the severity of his impairments was not based on substantial evidence and that he does in fact meet the prerequisites of a listed impairment. Plaintiff next argues that the ALJ failed to properly evaluate his ability to engage in sedentary work. In response, the Commissioner contends that the ALJ not only properly evaluated the severity of Plaintiff's impairment, but properly applied the law when concluding that Plaintiff had the capacity to engage in substantial gainful activity. The court will address Plaintiff's two arguments in turn.

### 1. *Plaintiff's Step–Three Argument*

At issue with respect to Plaintiff's step-three argument is Listing 1.05(C) of the regulations' appendix which describes "other" disorders of the spine, e.g., herniated nucleus puplosus and spinal stenosis, "with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months . . .: [1][p]ain, muscle spasm, and significant limitation of motion in the spine; and [2][a]ppropriate radicular distribution of significant motor loss with muscle weakness and sensory reflex loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.05(C) (2001). In a letter dated February 5, 2001, Dr. Kalia described Plaintiff's surgeries and opined that Plaintiff's condition "equals the degree impairment described" in Listing 1.05(C). (A.R. at 254.) Dr. Kalia then stated: "Because of residual pain and symptoms consistent with his initial injury [Plaintiff] is unable to ambulate without an assistive device and is unable to perform work requiring him to lift 20 lbs. or to lift 10 lbs. on a regular basis." (*Id.*)

The ALJ rejected Dr. Kalia's opinion, concluding that it was not supported by his own treatment records. Although Plaintiff calls this finding "preposterous," he does little to deconstruct it. Rather, Plaintiff simply argues that Dr. Kalia's opinion, conclusory as it is, is entitled to controlling

weight since Dr. Kalia is his treating physician. In the court's opinion, Plaintiff's argument falls short in several respects.

██ First, the determination of whether an individual meets a listed impairment is reserved to the Commissioner. *See* 20 C.F.R. § 416.927(e)(2) (2003). Accordingly Dr. Kalia's opinion regarding Listing 1.05(C) is not entitled to controlling weight.

Second, and more to the point, the ALJ had reason to find that the medical evidence did not appear to support the persistent and serious symptoms required by Listing 1.05(C). Dr. Kalia's own notes revealed that Plaintiff's condition had improved following his second surgery. As examples: on January 24, 2000, Dr. Kalia reported that Plaintiff was ambulatory and his lower extremity strength was improving (A.R. at 217); one month later, he noted that Plaintiff's x-rays demonstrated a stable fusion, that his neurological examination was unchanged and that he was feeling well (A.R. at 251); five months after the second surgery, Dr. Kalia's only finding was that Plaintiff had some numbness in his right leg (A.R. at 250); and, at his last appointment on August 21, 2000, Plaintiff reported that he was feeling much better, his x-rays revealed a stable fusion and Dr. Kalia told him that he did not have to be seen again for six months (*id.*). In short, the court finds substantial evidence for the ALJ's determination at step three that Plaintiff's impairment, while severe, did not equate to a listed impairment.

### 2. *Plaintiff's Step–Five Argument*

Plaintiff mounts a much more serious challenge to the ALJ's step-five determination that Plaintiff is able to engage in sedentary work. In essence, Plaintiff argues that, once having found that Plaintiff's "ability to perform all or substantially all of the requirements of sedentary work

is impeded by additional exertional and/or non-exertional limitations" (A.R. at 14), the ALJ failed to properly analyze Plaintiff's residual functional capacity. Although Plaintiff often threatens the merits of his own arguments by hyperbole and rhetorical flourishes, the court does believe, in the end, that the ALJ's analysis was sufficiently flawed as to require a remand.

██ The Commissioner acknowledges, as she must, that once a claimant establishes that he is unable to return to his past relevant work, the Commissioner (through an administrative law judge) must demonstrate that there are other jobs in the national economy that the claimant can perform. *See Hernandez v. Weinberger*, 493 F.2d 1120, 1122 (1st Cir. 1974) (citation omitted). To do so, the Commissioner may first look at tables— known as the Medical–Vocational Guidelines—which indicate what level of disability is associated with the claimant's residual functional capacity, taking into account various combinations of age, education and past work experience. *See Sherwin v. Sec'y of Health & Human Servs.*, 685 F.2d 1, 2 (1st Cir.1982). These tables are only determinative, however, if the claimant has solely exertional limitations or non-exertional limitations that do not substantially affect his range of work. *See* 20 C.F.R. § 416.969a (2003). *See also Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir.1989); *Lugo v. Sec'y of Health & Human Servs.*, 794 F.2d 14, 17 (1st Cir.1986); *Gagnon v. Sec'y of Health & Human Servs.*, 666 F.2d 662, 665 (1st Cir. 1981). If the claimant's non-exertional limitations significantly erode his occupational base, then the Commissioner must obtain expert testimony and may refer to the Medical–Vocational Guidelines only as a framework for the decision. *See Hegarty v. Sullivan*, 947 F.2d 990, 996 (1st Cir.1991) (citing *Ortiz*, 890 F.2d at 524).

Here, the ALJ found that Plaintiff's ability to perform the full range of sedentary work was, in fact, impeded by nonexertional limitations. Accordingly, the ALJ obtained the testimony of a vocational expert to determine whether Plaintiff could perform other work in the national economy. The ALJ asked the vocational expert the following hypothetical question: whether there were any jobs Plaintiff could perform if he: (1) could not lift more than ten pounds occasionally and five pounds frequently; (2) could sit for almost six hours and walk/stand for two hours in an eight hour day; (3) needed to have the liberty to interrupt periods of sitting with brief (two minute) periods of standing; (4) could only occasionally climb and balance; (5) was precluded from bending and twisting at the waist; and (6) was to avoid unprotected heights and machinery. (A.R. at 37–38.)

In formulating this hypothetical question, the ALJ considered and, in many respects, adopted Dr. Kalia's findings. For example, the hypothetical question took into account Dr. Kalia's opinion that Plaintiff had limited ambulation with no lifting or bending as well as Plaintiff's need to alternate between sitting and standing and to avoid bending and twisting at the waist. (See A.R. at 242.) The question also assumed sedentary work with lifting restrictions that were even greater than those suggested by Dr. Kalia. (See A.R. at 254.) In some contrast, the ALJ rejected certain findings of the agency's physicians. For example, the ALJ noted, but did not adopt, the agency physicians' determinations that Plaintiff was able to engage in "light," as distinct from "sedentary," work, could lift ten pounds frequently and twenty pounds occasionally and had no limitations on his ability to sit, stand or walk. (A.R. at 12.)

In response to the hypothetical question posed by the ALJ, the vocational expert testified that Plaintiff was unable to do "task work," but could work as an inspector, cashier and in protective services and that such jobs existed in substantial numbers in both the national and state economies. (A.R. at 38.) The ALJ relied on that testimony and found that Plaintiff was "not disabled." (A.R. at 14.)

Contrary to Plaintiff's argument, reliance on a vocational expert's testimony is appropriate when a claimant cannot perform the full range of sedentary work. *See* Social Security Ruling ("SSR") 83–12 *Titles II and XVI: Capability to Do Other Work—The Medical–Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work* (S.S.A.1983), also available at 1983 WL 31253. SSR 83–12 specifically advises use of a vocational expert when a claimant's residual functional capacity is for less than a full range of sedentary work. 1983 WL 31253, at *3. It further provides that such an expert can assess the effect of a limitation on a claimant's range of work, advise whether the claimant can perform a substantial number of jobs within his specific exertional level and identify jobs within his residual functional capacity. *Id.*

Also contrary to Plaintiff's argument, an administrative law judge's finding that a claimant is unable to perform the full range of sedentary work is not "tantamount to a finding of disability." *Cf. Sykes v. Apfel,* 228 F.3d 259, 268 n. 12 (3rd Cir.2000) ("A finding under step two of the regulations that a claimant has a 'severe' nonexertional limitation is not the same as a finding that the nonexertional limitation affects residual functional capacity."). Rather, as described, such a finding requires expert testimony to address the extent to which the claimant's limitations

would erode the occupational base. *See* SSR 83–12, 1983 WL 31253, at \*3.

Nonetheless, two problems with the ALJ's approach are evident. First, the ALJ did not adequately explain why Plaintiff was deemed to be able to sit for six hours in an eight hour day while at the same time needing to interrupt periods of sitting with brief, two minute periods of standing. *See* Social Security Ruling 96–9 *Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work—Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work* (S.S.A.1996), also available at 1996 WL 374185 (observing that vocational expert may be required where period between a claimant's regularly-scheduled breaks exceeds his capacity to remain seated). Plaintiff had testified that he could only "sit for awhile," meaning twenty minutes or half an hour, before he had to stand up for a little while. (A.R. at 27–28.) How this all translates into only two minutes of standing is unclear. Plaintiff also testified that his hip bothers him when he is "[c]onstantly sitting all the time." (A.R. at 33.) The ALJ's statement that Plaintiff's "description of his ongoing limitations is not reflected in the records from his medical sources" (A.R. at 113), is conclusory at best and fails to conform to the protocol established by *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 24–25 (1st Cir.1986).

Second, by the terms of SSR 83–12, alternate sitting and standing is a "special situation" which requires a more detailed review than happened here. *See Nguyen v. Chater*, 172 F.3d 31, 36 (1st Cir.1999) ("The inability to remain seated may constitute an exertional impairment which significantly erodes the occupational base for sedentary work and requires use of additional vocational resources.") (citation

omitted). As SSR 83–12 explains, an individual who "may be able to sit for a time, but must then get up and walk for awhile before returning to sitting ... is not functionally capable of doing ... the prolonged sitting contemplated in the definition of sedentary work..." *Id.*, 1983 WL 31253, at \*4. While "[t]here are some jobs in the national economy ... in which a person can sit with a degree of choice," those are typically professional and managerial ones. *Id.* On the other hand, "[u]nskilled types of jobs are particularly structured so that a person *cannot* adequately sit or stand at will." *Id.* (emphasis added). In other words, the vocational expert "should be consulted to clarify the implications for the occupational base." *Id.*

■ Here, the ALJ did not elicit from the vocational expert the kind of detailed clarifications which SSR 83–12 requires. At best, the vocational expert indicated that the jobs he believed suited Plaintiff had the "exertional [but not the nonexertional] levels" identified in the Dictionary of Occupational Titles ("DOT"). (A.R. at 38.) Standing alone, this testimony, in the court's estimation, is insufficient. *See Haddock v. Apfel*, 196 F.3d 1084, 1089 (10th Cir.1999) (holding that ALJ "did not elicit enough evidence with regard to skills for us to assess whether there is a conflict between the [DOT] and the [vocational expert]'s testimony on that job characteristic"). Accordingly, the court has little choice but to conclude that the Commissioner has failed to demonstrate that Plaintiff can engage in substantial gainful activity.

### 3. *Summary*

■ There being insubstantial evidence upon which to affirm the Commissioner's decision, the question arises as to the proper remedy. Although the question is close, the court has determined that

**208**

remand is the appropriate avenue of redress.

█ Pursuant to *Seavey v. Barnhart,* 276 F.3d 1 (1st Cir.2001), a court must remand for further proceedings if there is not a clear entitlement to benefits on the basis of the record before the court. *Id.* at 12 ("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency.") (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). To be sure, the administrative law judge in *Seavey,* in facts not unlike here, was found to have improperly relied on the Medical–Vocational Guidelines to the exclusion of a vocational expert. Nonetheless, this court cannot say that the additional testimony of the vocational expert adduced by Plaintiff was such as to have left the ALJ with "no discretion to act in any manner other than to award … benefits." *Id.* at 11. There being no such clear "outcome," *Id.* at 12, a remand is the better course of action. *See also Freeman v. Barnhart,* 274 F.3d 606, 609–10 (1st Cir.2001) (remand ordered even though vocational expert testified).

## IV. Conclusion

For the foregoing reasons, the Commissioner's motion is DENIED and Plaintiff's motion is ALLOWED. The matter will be remanded to the Social Security Administration for further proceedings consistent with this opinion.

IT IS SO ORDERED.