**Matt WEINBERG, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**Civ.A. No. 03–30035–KPN.**

United States District Court,
D. Massachusetts.

Sept. 30, 2003.

---

David P. Engle, Center for Public Representation, Northampton, MA, for Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER and THE COMMISSIONER'S MOTION FOR ENTRY OF JUDGMENT UNDER SENTENCE FOUR OF 42 U.S.C. § 405(g) WITH REVERSAL AND REMAND OF THE CASE TO THE COMMISSIONER (Document Nos. 13 and 16)*

NEIMAN, United States Magistrate Judge.

This matter is before the court pursuant to 42 U.S.C. § 405(g) which provides for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Social Security Disability Income ("SSDI") benefits. Matt Weinberg ("Plaintiff") claims that the Commissioner's decision denying him SSDI benefits—memorialized in a September 27, 2002 decision by an administrative law judge—is not supported by substantial evidence and is predicated on errors of law. With the parties' consent, the matter has been assigned to the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including entry of judgment. Currently at issue are two dispositive motions, one by each party.

The relevant question in most appeals from the Social Security Administration is whether the administrative law judge's decision is supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Here, however, the Commissioner has acknowledged that "the [September 27, 2002] decision of the administrative law judge ... was *not* based on substantial evidence." (Document No. 16 ("Commissioner's Brief") at 1 (emphasis added).) Given that concession, the only question before the court is the

appropriate remedy, i.e., whether the court should "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, without or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (sentence four).

In his motion, Plaintiff argues that the court should "reverse the . . . decision . . . and order the [Commissioner] to pay . . . Plaintiff any and all [SSDI] benefits to which he has been entitled since [November 10, 1994]." (Document 13 ("Plaintiff's Motion") at 2.) The Commissioner, on the other hand, asserts that "[r]emand is necessary for development of the record on the issue of whether there are other jobs in the national economy that the plaintiff could perform." (Commissioner's Brief at 2.) For the reasons stated below, the court deems Plaintiff to have the stronger argument. Accordingly, Plaintiff's motion to reverse will be allowed and the Commissioner's motion to remand will be denied.[1]

## I. BACKGROUND

Since only the remedy is in dispute, the following background is somewhat abbreviated. Plaintiff was born on June 12, 1968, has never married and has no children. (Document No. 9: Administrative Record ("A.R.") 116–17.) After an extended period of homelessness, Plaintiff now lives in a rooming house in Northampton, Massachusetts. (A.R. at 31.)

Plaintiff suffered emotional and physical abuse as a child and, by age thirteen, had developed "essential tremors" which increasingly compromised his ability to use his hands, his self-esteem and his employability. (A.R. at 213, 469–70.) Plaintiff nevertheless graduated from high school as a special education student and, for the next four years, served overseas as a United States Marine. (A.R. at 35–36, 135.)

For three years following his honorable discharge, from 1991 to 1994, Plaintiff worked as a shipper-receiver in a Burger King distribution warehouse. (A.R. at 130.) By November of 1994, however, his tremors, post-traumatic stress disorder ("PTSD") and alcohol use had worsened to the point where he had to leave his job. (A.R. at 42, 129.) Ever since, Plaintiff has worked only sporadically, e.g., as a counter-person in a delicatessen, a packer of tubed products and a Salvation Army bell-ringer. (A.R. at 42–45.)

Plaintiff's earliest medical records for purposes here—from October and December of 1997—show that he suffers from generalized anxiety disorder, prolonged PTSD, essential tremor, gastroesophogeal reflux disease, psoriasis, dextroscoliosis, depression and alcohol abuse. (A.R. at 181–82, 208, 214, 233, 236, 250, 260.) For these conditions, Plaintiff received treatment from the Veterans Administration Medical Center in Northampton and participated in group psychotherapy, substance abuse treatment, work therapy and Alcoholics Anonymous meetings. (A.R. at 182, 260–62, 268, 291.)

In June of 2001, Plaintiff's primary care physician, Dr. Jerald Feinland, observed that Plaintiff's tremor was so severe that he had difficulty signing his name. (A.R. at 465.) Dr. Feinland also opined that Plaintiff had been using alcohol as a form of self-medication. (*Id.*) In a follow-up examination on August 8, 2001, Dr. Feinland diagnosed Plaintiff with Attention Deficit Hyperactivity Disorder, fatigue, depression, anxiety and alcoholism. (A.R. at

---

**1.** As a result, the court does not reach Plaintiff's "alternative" argument, that the court "credit . . . Plaintiff with a constructively filed [Supplemental Security Income] application . . . and remand this matter to the [Commissioner] for a new . . . hearing and a new decision which fairly reflects the evidence of record . . . ." (Plaintiff's Motion at 2.)

463.) By October 22, 2001, Plaintiff was "hardly drinking" but, according to Dr. Feinland, his tremor remained severe and exhausting, his frequent nocturnal awakenings were worse, and he continued to suffer from anxiety, insomnia, depression and PTSD. (A.R. at 462.)

In August of 2001, Plaintiff began seeing a psychotherapist, who noted "the effects of [Plaintiff's] childhood trauma from chronic abuse," that his tremor "interfered with writing [and] caus[ed] problems in self-esteem and work settings," and that he had "symptoms of depression, anxiety, and flashbacks since his early teen years." (A.R. at 469–72.) On referral, Dr. Schuyler Whitman, a psychiatrist, noted on January 18, 2002, that an increased dose of klonapin was helping. (A.R. at 477.) Unfortunately, by the time Plaintiff saw Dr. Whitman on March 14, 2002, he was developing a tolerance for klonapin and experiencing severe anxiety in the afternoon, a racing feeling in his stomach and increasing tremors. (A.R. at 475.) Accordingly, on May 10, 2002, Dr. Whitman—who also noted that Plaintiff was suffering worsening insomnia and paranoid fears—added an anti-psychotic medication, risperdel, to Plaintiff's regimen. (A.R. at 473–74.)

On April 4, 2001, in the midst of these medical benchmarks, Plaintiff applied for SSDI benefits, alleging that his disability began on November 10, 1994. (A.R. at 116–18.) His application was denied initially and upon reconsideration. (A.R. at 79–83, 92–95.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (A.R. at 96–97.) In the interim, on May 25, 2001, Plaintiff was examined by a psychologist for the state Disability Determination Services who summarized Plaintiff's prognosis as follows: "Mr. Weinberg has been treated with various medications for anxiety and has been hospitalized approximately 50 times. He has tried relaxation therapy and behaviorally oriented psychological counseling and none of this has helped. His condition is not expected to change significantly in the future." (A.R. at 443.)

Plaintiff's administrative hearing was held on July 9, 2002. (A.R. at 23–76.) As described more fully below, a vocational expert (1) testified that Plaintiff was unable to return to his past relevant work as a warehouseman, and (2) answered, in the negative, a series of questions about whether Plaintiff was able to perform any other work. (See A.R. at 61–75.) After reviewing the evidence of record, however, the ALJ concluded in a decision dated September 27, 2002, that Plaintiff was not disabled. (A.R. at 13–22.) Plaintiff's request for review by the Appeals Council was denied on December 23, 2002, thereby making the ALJ's decision the final decision of the Commissioner. (A.R. at 5–6.) See 20 C.F.R. § 404.967 (2003). In due course, Plaintiff initiated this lawsuit.

## II. Discussion

Under the Social Security Act ("the Act"), an individual is entitled to SSDI benefits if, among other things, he has an insured status and, prior to the expiration thereof, was under a disability. See 42 U.S.C. § 423(a)(1)(A) and (D). Plaintiff's insured status is not challenged. The question, therefore, is whether he suffers from a disability.

### A. Disability Standard and the ALJ's Decision

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is considered disabled under the Act

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). *See Bowen v. Yuckert,* 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth, .... does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy?

If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: that Plaintiff has not engaged in substantial gainful activity since the alleged onset of his disability (question one); that he has severe impairments, although not severe enough to be listed in Appendix 1 (questions two and three); and that, notwithstanding the severity of Plaintiff's impairments, he is able to perform his past relevant work as a warehouseman (question four). As a result, the ALJ concluded, without discussing the fifth question, that Plaintiff is not disabled. (A.R. at 20–21.)

### B. *Analysis of ALJ's Decision*

To her credit, the Commissioner concedes that the ALJ's decision at the fourth step of the sequential analysis is not based on substantial evidence. Specifically, the Commissioner acknowledges that "[t]he [ALJ's] determination that the plaintiff could perform his past relevant work is not supported by the testimony of the vocational expert." (Commissioner's Brief at 1.) Rather, the import of the vocational expert's testimony was that Plaintiff's multiple impairments—e.g., his inability to work with "both hands" along with his need for "slow paced type of work" and "no contact with the public"—made it impossible for him to return to his past work as a warehouseman. (See, e.g., A.R. at 72–74.)

As a result, the Commissioner, as described, seeks to have the matter remanded for a hearing regarding step five of the sequential analysis. For his part, Plaintiff seeks an order reversing the decision outright and requiring the payment of all

benefits due. In essence, Plaintiff asserts that there is more than sufficient evidence in the record to demonstrate that, in addition to his inability to do his previous work (step four), he is unable to engage in any substantial gainful activity (step five). The court finds Plaintiff's position persuasive.

Given the issue before the court, it is somewhat surprising that neither party cites the First Circuit's relatively recent decision in *Seavey v. Barnhart*, 276 F.3d 1 (1st Cir.2001). There, the court grappled with what it described as "an issue of importance in the law of the circuit on Social Security Appeals," to wit, "when is it appropriate for a court to remand for further proceedings and when is it appropriate to order payment of social security benefits?" *Id.* at 4. After analyzing various approaches to the issue, the court settled on the following test:

> [T]he rule we adopt is that ordinarily the court can order the agency to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award ... benefits. Put differently, if the evidence and law compelled one conclusion or the other, then the court could order an award of benefits .... For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. Similarly, if correcting the legal error clarified the record sufficiently that an award ... of benefits was the clear outcome, then the court may order payment .... Conversely, if an essential factual issue has not been resolved, ... and there is no clear entitlement to benefits, the court must remand for further proceedings.

*Id.* at 11 (citation and footnote omitted). In essence, *Seavey* explains that a rehear-ing is "ordinarily" the proper course unless "the underlying facts and law are such that the agency has no discretion to act in any manner other than to award ... benefits." *Id.* The court believes that this is just such a case, i.e., one in which the Commissioner has no choice but to provide benefits.

Once Plaintiff established at step four that he was unable to return to his past relevant work, the Commissioner, through testimony adduced at the administrative hearing, was required to demonstrate at step five that work existed in significant numbers in the national economy that Plaintiff could perform. *See Rodriguez v. Sec'y of Health & Human Servs.*, 893 F.2d 401, 404 (1st Cir.1989). As is common, the ALJ confronted this task by obtaining the testimony of a vocational expert. Having reviewed that testimony, the court finds that the vocational expert was unequivocal that Plaintiff's limitations not only prevent him from returning to his past relevant work, but from performing all other jobs that exist in the national economy.

For one thing, the vocational expert confirmed that, given Plaintiff's hand limitations, there are no jobs available to him at the "medium" level of exertion. (A.R. at 72.) To be sure, the vocational expert then hypothesized that, at the "light" level of exertion, Plaintiff could conceivably "work in machine operation such as in a marking machine, stamping or labeling machine, or in a patenting machine." (*Id.*) However, the vocational expert quickly recanted that opinion "[b]ecause those are all fast paced jobs" which Plaintiff could not perform. (A.R. at 73.)

Unfazed, the ALJ then asked if there was "anything available" to Plaintiff at either the "light" or "sedentary" level, to which the vocational expert clearly answered "no":

> A [by vocational expert]: Well, [Plaintiff's limitations] eliminate[ ] all produc-

tion work, all service work, all assembly work.

Q [by ALJ]: Would security positions be feasible?

A: No.

Q: And what would eliminate then when you—

A: I would say dealing with the public.

Q: Dealing with the public? What night watchman going around checking stations at a factory—is that—

A: If you were limited to contact with the public, but all contact with the public.

Q: Now, if we went even further down in capacity to sedentary, would that actually open up something, or would it—

A: Oh, I think if a person were capable of light, then it would include sedentary in my mind, Your Honor.

Q: So what would eliminate the—let's say the surveillance monitor situation? I'm just curious as to what limitation would eliminate that?

A: The slow paced type of work. That calls for pretty good ability to respond to stimuli and act in a quick and rapid fashion. I don't see that with a slow paced type of job. And a job that calls for only occasional interaction with co-workers, and so are supervisors. And no contact with the public. It presents problems.

Q: Pardon me?

A: That presents problems for placing an individual. You got hand limitations, limitations dealing with people, and limitations with repetitivity [sic] of the activity, plus simple, routine, repetitive work. Surveillance monitor would be a simple routine, repetitive, but it's competitive, and more fast paced than slow paced. Something like custodial, janitorial, cleaning, things of that nature which would be more medium work. But then that's precluded by the hand limitations.

. . . .

... Farm labor work would be fast pace. Animal ... attendant work would be medium, not light.

(A.R. at 73–75.)

Granted, the vocational expert testified further—when pressed by the ALJ about custodial positions that would require no interaction with the public—that "[t]here are *occasionally* night building cleaner positions that are of the light range." (A.R. at 75.) For SSDI purposes, however, an "occasional" job is not "work which exists in the national economy." *See* 42 U.S.C. § 423(d)(2)(A) (" 'work which exists in the national economy' means work which exists in *significant numbers* ...' ") (emphasis added). *Accord Thomas v. Sec'y of Health & Human Servs.*, 659 F.2d 8, 9 (1st Cir.1981); 20 C.F.R. § 404.1566(a) (2003). Accordingly, the vocational expert was correct in abandoning this avenue of analysis. In effect, then, the testimony of the vocational expert established, at the fifth step of the sequential analysis, that Plaintiff's impairments prevent him from performing other work in the national economy. Proof of Plaintiff's disability, therefore, may fairly be described, as required by the First Circuit for purposes of reversal, as either "overwhelming" or "very strong ... [with] no contrary evidence." *Seavey*, 276 F.3d at 11. *Compare Perkins v. Barnhart*, 266 F.Supp.2d 198, 208 (D.Mass.2003) (remanding where "court cannot say that the additional testimony of the vocational expert ... left the ALJ with no discretion to act in any manner other than to award benefits") (citation and internal quotation marks omitted).

In sum, the court deems this to be one of those rare cases where there is administrative error but where a rehearing would serve no purpose. As the vocational ex-

pert unequivocally testified, Plaintiff is disabled; he can neither return to his previous work nor engage in any other work that exists in the national economy. Because the Commissioner "has no discretion to act in any manner other than to award . . . benefits," her motion to remand will be denied and Plaintiff's motion to reverse will be allowed.

### III. CONCLUSION

For the foregoing reasons, the Commissioner's motion to remand for a rehearing is hereby DENIED and Plaintiff's motion to reverse the Commissioner's decision is hereby ALLOWED. The matter will be remanded to the Social Security Administration for the sole purpose of calculating the SSDI benefits due.

IT IS SO ORDERED.